Humphries v. Davis.

No. 11,717.

HUMPHRIES v. DAVIS.

DESCENTS.—*Adoptive Child.*—*Adoptive Parents.*—Where a child, adopted by a husband and his wife jointly, dies, without children or their descendants, the owner of land inherited from the adoptive mother, the surviving husband and adoptive father inherits such land, and it does not descend to the natural mother.

SAME.—*Status.*—The rights of descent flow from the legal status of the parties, and where the status is fixed the law supplies the rules of descent.

SAME.—*Statutes.*—*Construction of.*—A statute introducing a new right, or creating a new status, is not to be construed as a separate and independent law, but is to be considered as forming part of one uniform system, and, in giving it effect, it is proper for the courts to look to other statutes, to the common law, to the principles of natural justice, to the source from which the new right was derived, and to the object intended to be accomplished by the Legislature.

From the Montgomery Circuit Court.

*G. W. Paul* and *J. E. Humphries,* for appellant.

*E. C. Snyder, P. S. Kennedy* and *S. C. Kennedy,* for appellee.

ELLIOTT, J.—Isaac Davis and his wife, Jessie Davis, adopted, as their child, Emily Davis, the natural daughter of Elizabeth Davis, now Elizabeth Krug. About a year after the adoption of the child, Mrs. Jessie Davis died, leaving as her only heirs her husband and her adopted daughter, and within a year the adopted daughter also died. The natural mother claimed two-thirds of the land which her child inherited from Mrs. Jessie Davis, and conveyed part of it to the appellant. This claim the surviving husband resists, and the question is, Who shall have the land, the surviving husband or the natural mother? We deem it one of the important factors in this legal problem, that the land vested in the child solely by virtue of its legal relationship to Mrs. Davis, and not by virtue of its natural relationship to any one. The title vested in the adopted child by force of law, and not because of any inheritable right springing from a natural kinship.

In the case of *Davis* v. *Krug,* 95 Ind. 1, this element was

considered one of importance, and it was held that property derived by the child from one of the persons by whom it had been adopted went to its other parent by adoption, rather than to its natural mother. We limit our decision in this instance, as it was limited in the former case, to the property derived from one of the adopting parents by inheritance, and confine it to the question of the rights of the natural mother as against the surviving parent of the deceased child, who became such by law, and not by nature ; but, in thus limiting our decision, we do not mean to intimate that if the property came to the adopted child otherwise than by inheritance from kinsmen of its own blood, the adoptive parents would not inherit to the exclusion of the natural mother. The case to which we have referred is decisive of this controversy, but as it has been vigorously assailed, we have, at the earnest solicitation of counsel, again examined the question.

The equity of the case is with the surviving husband and against the natural mother who gave up her child, sundering all maternal ties, and suffering a stranger to take a mother's place. The husband, who enabled his wife to acquire or preserve her property, has infinitely stronger claims than the natural mother, who cast aside her child. Rules of law are intended to secure justice, and justice requires that the husband who has maintained the wife should be preferred to the mother of a child which was the child of his wife only by adoption. Equity is natural justice, and natural affection and natural right make a strong equity in the husband's favor. Suppose that the claim were urged by a surviving wife, instead of the husband, in such a case as this, would it then be doubted that the wife, whose joint labor and care had aided in accumulating the property, should be preferred to the natural mother who was a stranger, both in blood and in law, to the person who was the source of title? Must the wife be put off with a paltry share to make room for a stranger who has no claim upon the bounty of the husband, nor, of right, any place in the husband's affections? The principle which rules

in the one case must govern in the other. We have shown
the equity of the case for the reason that equity has a potent
influence in the construction of statutes. Courts always en-
deavor to so construe a statute as to make it an instrument
of justice. As HOBART, C. J., long ago said, "equity must
necessarily take place in the exposition of statutes." Courts
can neither wrest words from their plain meaning, nor violate
the spirit of a statute upon their own notions of natural jus-
tice ; but, where the statute is general in its terms, and not
clear and definite in its letter and scope, courts may give it
such a construction as will make its operation just and bene-
ficial. To aver the contrary would be to assume that the Leg-
islature did not intend to make a just law. There is nothing
in the statute before us requiring us to declare that the rights
of a surviving husband shall yield to the rights of the natural
mother of a child which he had joined with his wife in adopt-
ing. When the statute is read by the light of the civil law
from which its principles are borrowed, and is considered in
connection with the general principles of the law of descent
and the statutes upon that subject, it becomes clear that its
construction must be that which natural justice requires.

The common law made no provision for the adoption of
children, and we can get no light from that source. *Krug* v.
*Davis*, 87 Ind. 590; *Ross* v. *Ross*, 129 Mass. 243; S. C., 37
Am. R. 321. The Roman law made provision for adopting
children, and the provisions of that law, as revised and
changed by Justinian, formed a complete system. Sandars'
Justinian, 103, 105, 109. The adopted child was, as that
law declared, "assimilated, in many points, to a son born in
lawful matrimony." That law preserved to the child all the
family rights resulting from his birth, and secured to him all
the family rights produced by the adoption. Sandars' Justin-
ian, 105. The Supreme Court of Louisiana, in discussing this
subject, says: "And the effect was such, that the person adopted
stood not only himself in relation of child to him adopting,
but his children became the grandchildren of such person."

At another place the court said: "Now, when in an enabling or permissive statute, the Legislature has used a word so familiar in its ordinary acceptation, and so well known in the sources of our law, does it become the judiciary to say that it has not such meaning, because the law-giver has not himself expressly defined the sense in which he intended the word should be taken?" It is also said: "The law-giver ought not to be supposed ignorant of this state of things, or to use a term in a more restricted sense than it was formerly known to our laws." *Vidal* v. *Commagere*, 13 La. Ann. 516. It is true that the remarks of the court apply with rather more force to a State which has adopted the civil law than to one where the common law prevails, but they, nevertheless, declare a general principle which has a place in all enlightened systems of jurisprudence, for it is established law that where a rule is borrowed from another body of laws, courts will look to the source from which it emanated to ascertain its effect and force. *City of Valparaiso* v. *Gardner*, 97 Ind. 1. If, as the civil law so fully provided, a child of the adoptive son stood in the relation of grandchild to the adoptive father, then the son himself must stand as the child of that father. The statute of Massachusetts makes some exceptions as to the child's status, and it was held that the adoptive child as to property of the adoptive father stood as a natural child, save in so far as the exceptions declared otherwise, the court saying: "The adopted child, in this case, therefore, in construing her father's settlement, must be regarded in the light of a child born in lawful wedlock, unless the property disposed of by the settlement falls within one of the exceptions." *Sewall* v. *Roberts*, 115 Mass. 262.

In *Ross* v. *Ross*, *supra*, it was said, in reviewing the cases of *Schafer* v. *Eneu*, 54 Pa. St. 304, and *Commonwealth* v. *Nancrede*, 32 Pa. St. 389: "But the opinion in each of those cases clearly recognizes, what indeed is expressly enacted in the statute, that, as between the adopted child and the adopting father, the child has all the rights and duties of a child, and the capacity to inherit as such." Elsewhere in the opin-

ion from which we have quoted, it is said: "It is the rights, duties and capacities, arising from the event which creates a particular status, that constitute the status itself and afford the best definition of it." It is true that the law can not do the work of nature and create one a child who by nature is a stranger, but it may fix the legal status of the child. While, therefore, the Pennsylvania court is right in saying that the law can not make the child a natural one, the conclusion that the status of the adoptive child to the adoptive father may not be fixed by law does not follow by any means. The law may declare the status, and from the status courts must determine the correlative rights of parent and child thus created. One of the acutest of legal minds and clearest of writers says: "There are certain rights and duties, with certain capacities and incapacities to take rights and incur duties, by which persons, as subjects of law, are variously determined to certain classes. The rights, duties, capacities, or incapacities, which determine a given person to any of these classes, constitute a condition or status which the person occupies, or with which the person is invested." 1 Austin Juris. 41.

In *Burrage* v. *Briggs*, 120 Mass. 103, this doctrine was carried very far, for it was there held that the status of the adoptive child was such that it would take as a child under a residuary clause of the adoptive father's will, where the specific legacy had lapsed. It was decided in *Lunay* v. *Vantyne*, 40 Vt. 503, that as to the right to recover for services there was no difference between an adoptive and a natural child.

In the case of *Barnes* v. *Allen*, 25 Ind. 222, it was held that the adoptive child was the heir of the adoptive father in the degree of a child, and was entitled to inherit from him all the estate of which he could deprive his wife. This is impliedly an assertion that as to the adoptive parent the status of the adoptive child is, for the purpose of inheriting from the father, that of a natural child. The court, in *Isenhour* v. *Isenhour*, 52 Ind. 328, said: "The law can endow an adopted child with all the rights in property of a natural child, but it has

not the power to make him the natural child of any woman but his natural mother." It was also said, in speaking of the adoption by the husband, instead of by both the husband and wife, that " If he had been adopted by both, perhaps he might have been held as a child ' by a previous wife,' within the proviso in section 24 of the act regulating descents." The cases of *Krug* v. *Davis, supra,* and *Davis* v. *Krug, supra,* very explicitly affirm that as to the adoptive parents and their property, the status of the person adopted is that of a natural child.

In a recent text-book it is said : "And the rights of the parent by adoption are treated substantially as those of a natural parent." Schouler Dom. Rel., section 232. This author thus interprets our case of *Barnhizel* v. *Ferrell,* 47 Ind. 335 : "An adopted child usually inherits from the adopting parent, and *vice versa;* but otherwise as to collateral kindred." Schouler Dom. Rel., section 232, n.

In the case referred to, the court correctly laid down the law as to the status of the child, but, misled by confusing a natural relation with a legal status, was carried to an erroneous conclusion. The failure to give just importance to the difference between a legal status and a natural relation is the error that invalidates the reasoning in that case, for the court there affirmed the existence of the status, but stripped it of the incidents inseparably annexed to it, and this was a plain violation of the logical principle that where properties necessarily inhere in the thing, they can not be separated from it. Having affirmed the existence of the legal status, the properties inseparably connected with it should also have been affirmed as governing facts in the case. That we are right in our view is evidenced by the summing up of the result of the reasoning in that case. " In such case," said the court, in speaking of the adoption by the father only, " the child might inherit from the adopted father, but not from his wife. He would have an adopted father, but not an adopted mother. He would have no right as her child." This, surely, is a full

recognition of the status of the adopted child, and, if it be, then the correlative relation of father must also exist. What was decided in *Hole* v. *Robbins*, 53 Wis. 514, is shown in the concluding statement of the opinion, which reads thus : " In the case at bar, the property which is claimed by the adopted parents came to the child from the natural parents, and justice would seem to demand that it should descend to them or their kindred upon his death ; and there being nothing in the statutes concerning the adoption of children which clearly indicates an intention on the part of the Legislature to change the order of descent from the adopted child, we must, upon authority and principle, hold that the property descends according to the general law regulating the descent of real estate." It will be readily perceived that the decision from which we have quoted can not be authority to prove that the natural heirs shall take, to the exclusion of a surviving adoptive parent, property which the child acquired solely by virtue of his legal status, or that the status of the adoptive child is not, as to all legal incidents, the same as that of a natural child.

The point of the decision in *Wagner* v. *Varner*, 50 Iowa, 532, is, that where a father adopted two children of his daughter, and afterwards died, leaving no will, the children so adopted inherited from him as his own children, and inherited, also, the share of their deceased mother. The court said : " By the act of adoption these children became in a legal sense the children of John Bumer." This is an explicit declaration of the legal status created " by the event " of adoption.

In *Keegan* v. *Geraghty*, 101 Ill. 26, the court held that the adoptive child could only inherit from the adoptive parents, and could not inherit from the lineal or collateral heirs of the parents, and this ruling, it is clear, does not controvert the proposition that the status is the correlative one of parent and child. The case of *Reinders* v. *Koppelmann*, 68 Mo. 482, decides that the status of parent and child exists, but that the right of inheritance is, by force of the statute, vested only in the child, thus narrowing the whole question to the one statute.

Humphries *v.* Davis.

The authorities we have discussed unite in affirming that the status of an adoptive child for all legal purposes, and as to the property inherited from an adoptive parent, is that of a natural child. This supplies a premise which guarantees the conclusion, that the adoptive father must inherit from it property which came to it from his wife and the child's adoptive mother. It is, indeed, the only logical conclusion deducible from the premise granted. If there is a child, there must be a parent. The status of child necessarily imports that of parent. From this conclusion there is no escape unless logic is defied or disregarded. Parent and child are correlative terms, the one relation implies the other. It is logically impossible to conceive the relation of child without in the same conception implying that of parent. To affirm that there is a child is to affirm, upon axiomatic principles, that there is a parent, for one correlate implies the existence of that of which it is the correlative. The logicians thus state this logical principle: "Where the terms are correlative in the same subject, if one is predicated of the subject the other must be also." If, then, we predicate of the subject, property inherited from an adoptive mother, the status child, we must predicate of the same subject the correlative status, father.

It is, as we have seen, the legal status of the person respecting the subject that determines his legal rights. To again quote from Austin: "The law of persons is the law of status or conditions. * * * The rights and duties, capacities and incapacities which constitute a status or condition, are commonly considerable in number and various in kind. * * * Such are the rights and duties, capacities and incapacities of husband and wife, parent and child, guardian and ward." 2 Austin Juris. 709, 711. As the status of the surviving husband and adoptive father is that of father, his interest in the land which the deceased child held in virtue of the rights vested in it by adoption is that of a father, since it is of that property, as the subject, that the status of parent and child

is predicated. This is a just as well as a logical result. It is not to be presumed that the Legislature meant to violate logical rules by creating the legal relation of child without the corresponding one of parent, nor that they meant to thrust out the surviving husband and father for the benefit of a person that was a stranger to the ancestor who was the source of title.

Not only is the conclusion which we have stated that to which the cold rules of logic and the benign ones of natural equity lead, but it is also the conclusion to which the general principles both of the American law and the Roman law lead. It is a principle of both systems of jurisprudence, that in case of failure of descendants capable of taking, the inheritance shall go back to the kinsmen of the blood from which it came. Our statute fully recognizes this general principle, for it provides that when the inheritance comes from the paternal line, it shall go back to the kinsmen of that blood, but when the inheritance comes from the maternal line, it shall go back to the kinsmen of the mother's side. R. S. 1881, section 2471. In analogy to this general principle, it should be held that one connected by so close a relationship as that of husband should be preferred to a person who bore no relationship whatever to the ancestor. It must be presumed that the Legislature meant the statute for adoption of children to confer rights consistent with the general policy of the law, and not to produce discord by breaking the unity of the general system. To produce uniformity and harmony, it must be held, as we now hold, that the death of the adoptive child casts the inheritance which came to him through the joint adoption, back to his adoptive father, and not upon the natural mother who was an utter stranger to the person from whom the title flowed. It may be that this would require that what the adoptive child inherits from its natural kinsmen shall go back to them, but, if so, it is a good result, for this is no more than just. This was the civil law, and the principle is declared and enforced in two of the cases cited.

The rule which we adopt does not cut off the adoptive child from inheriting from its natural relatives. It may inherit from them and from its adoptive parents. This was the rule of the civil law. Sandars' Justinian, 105. The principle is declared in *Wagner* v. *Varner, supra,* where it was said: "Because of the adoption the child acquires certain additional rights, but there is nothing in the act of adoption which in and of itself takes away other existing rights, or such as may subsequently accrue." The reason which supports this rule does not apply to the mother. She, in legal effect, severs all legal rights to the property which the child may acquire by virtue of its status to the adoptive parents, for, as to that property, she permits the correlative relation of parent and child to exist between the child and the adoptive parents. It does her no injustice to leave her with her right to such property as her child may acquire otherwise than through the adoptive parents, but it would do great injustice to permit her to secure the property acquired by her child in virtue of both its natural and adoptive rights.

If it be the law that an adoptive parent can not inherit from the child of his adoption in such a case as this, then most harsh and unjust consequences will result from the law. We suggest one instance where this would be the result: A child is adopted by a husband and wife, the wife dies the owner of $100,000 of real estate, then the child dies, without a natural kinsmen, near or remote, and the result (if the law be that the adoptive father can not inherit) is that two-thirds of the land escheats to the State. We have put this case because it is not an improbable one, for many children who are adopted into families are waifs whose parents and kinsmen are unknown. We are not willing to declare a rule that will lead to such results.

The Supreme Court of Missouri recognize and lament the injustice of the rule which it adopts, for we find in the opinion this language: "It may seem great injustice that the property derived from one source should go in a channel never

contemplated by the donor." In speaking of the rule of the code Napoleon and of the civil law, that the property which came to the child from its natural kinsmen shall go back to them, and that when the estate came from the adoptive parents, it should go back to these parents, the court said: "Such a provision commends itself to our sense of justice, but it is not in our statute. What changes, if any, were intended to be made in our statute of descents in connection with this law of adoption is a mere matter of conjecture, and we have no authority to depart from the rules of descent established in the general statute on that subject." We concur with that learned court in its denunciation of the rule it adopts, but we can not think that it was necessary to adopt it. We are convinced that the court, in *Barnhizel* v. *Ferrell, supra,* and in the case from which we have quoted, took entirely too narrow a survey of the question. A statute is not to be construed as if it stood solitary and alone, complete and perfect in itself, and isolated from all other laws. It is not to be expected that a statute which takes its place in a general system of jurisprudence shall be so perfect as to require no support from the rules and statutes of the system of which it becomes a part, or so clear in all its terms as to furnish in itself all the light needed for its construction. It is proper to look to other statutes, to the rules of the common law, to the sources from which the statute was derived, to the general principles of equity, to the object of the statute, and to the condition of affairs existing when the statute was adopted. *Taylor* v. *Board, etc.,* 67 Ind. 383; *State, ex rel.,* v. *Swope,* 7 Ind. 91; *Prather* v. *Jeffersonville, etc., R. R. Co.,* 52 Ind. 16; *Allison* v. *Hubbell,* 17 Ind. 559; *Aurora, etc., R. R. Co.* v. *City of Lawrenceburgh,* 56 Ind. 80; *Hedrick* v. *Kramer,* 43 Ind. 362. As it was said in *Aurora, etc., R. R. Co.* v. *City of Lawrenceburgh, supra,* "Construction has ever been a potent agency in harmonizing the operation of statutes, with equity and justice." Statutes are to be so construed as to make the law one uniform system, not a collection of diverse and disjointed fragments. When this principle of con-

struction is adopted, " an enactment of to-day has the benefit of judicial renderings extending back through centuries of past litigation." Bishop Written Laws, section 242*b*. "A statute," says the author just referred to, " must be construed equally by itself and by the rest of the law. The mind of the interpreter, if narrow, will stumble." " The completed doctrine, resulting from a bringing together of its parts, is, that all laws, written and unwritten, of whatever sorts and at whatever different dates established, are to be construed together, contracting, expanding, limiting, and extending one another into one system of jurisprudence, as nearly harmonious and rounded as it can be made without violating unyielding written or unwritten terms." Bishop Written Laws, sections 113*a*, 86.

Judgment affirmed.

Filed Jan. 31, 1885. Petition for a rehearing overruled Feb. 10, 1885.